

# AFFIDAVIT

I, Gary Parker, Task Force Officer with the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, depose and state that:

## I. INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is empowered by law to conduct investigations of and make arrests for offenses enumerated in 18 U.S.C. § 2516. I am currently investigating Charles Algernon BOOMER III, who has been distributing large amounts of cocaine and cocaine base, or "crack" cocaine, in Hampton Roads for the past several years.

1. I have been employed as a DEA special agent since 1993. During that time, I have completed extensive training emphasizing narcotic investigations and enforcement, to include training on laundering of drug proceeds. I have conducted and assisted in investigations into the unlawful possession, possession with the intent to distribute, and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and drug-trafficking conspiracies, in violation of 21, United States Code, Section 846. I have also prepared and executed many arrest and search warrants for criminal offenses involving distribution and conspiracy to distribute controlled substances. I am familiar with the methods in which traffickers conduct their illegal activities, to include communication methods, asset management, and narcotic transactions.

2. I have conducted numerous complex international, and multi-jurisdictional investigations. I am familiar with the ways in which traffickers conduct their business, including, but not limited to the following: their methods of importing and distributing illegal drugs; their use of communications facilities; their transportation of platforms to arrange for and coordinate those



distributions; their use of codes to conduct their transactions; and their financial vehicles to launder the proceeds of their illegal drug transactions.

3. I am familiar with the facts and circumstances of this investigation based on firsthand knowledge and information summarized in reports I have reviewed. I have compiled information derived from discussions and interviews with experienced law enforcement officers and agents. I have not set forth each and every fact learned during the course of this investigation, but have only set forth those facts that I believe are relevant to establish probable cause to obtain an arrest warrant.

## II. CRIMINAL CHARGES

4. I make this affidavit in support of a criminal complaint and arrest warrant for Charles Algernon BOOMER III. This Affidavit will show probable cause to believe that BOOMER has been involved in a conspiracy with others to distribute and possess with intent to distribute 280 grams or more of crack cocaine and five kilograms or more of cocaine, both Schedule II substances, within the Eastern District of Virginia and elsewhere, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A).

5. The Affidavit will also show that BOOMER both possessed with intent to distribute and distributed cocaine multiple times, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and possessed with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D).

6. Finally, the Affidavit will show that BOOMER, a felon, illegally possessed a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and that he possessed that gun in furtherance of, and used and carried that gun during and in relation to, drug-trafficking crimes,

2

namely possessing with intent to distribute cocaine and marijuana, in violation of 18 U.S.C. § 924(c)(1)(A).

## III. FACTS SUPPORTING PROBABLE CAUSE

7. On September 17, 2018, at about 11:07 p.m., officers from the Portsmouth Police Department were dispatched to 5 Freedom Court, Portsmouth, Virginia in reference to two individuals with gunshot wounds. Upon arrival, Officer Miguel Montero observed a white Ford Fusion bearing Virginia tags VZW-3958 leaving Freedom Court. Officer Montero blocked the roadway and made contact with the Ford Fusion. As Officer Montero approached the vehicle, Officer Montero smelled a strong odor of marijuana omitting from the vehicle. Office Montero identified the driver as Craig Dawson, the front passenger as Keith Redman, and the only rear passenger, who was sitting behind Dawson, as BOOMER.

8. Officer Montero observed that Redman had bloodstains on his white t-shirt and asked if anyone had been shot, but received no answer. Office Montero then questioned Redman in reference to the bloodstain on Redman's shirt. Redman acknowledged that he had been shot, and indicated that the occupants of the vehicle were on their way to the hospital. When asked to step out of the vehicle, Redman complied requested and met with medical personnel.

9. As Redman walked from the vehicle, BOOMER opened the rear driver's side door and stepped out. Officer Montero stepped in front of BOOMER and observed lying on the seat where BOOMER had just been sitting two clear plastic bags containing a total of roughly 47.1 grams of suspected crack cocaine, another clear plastic bag containing a total of roughly 8.9 grams of suspected marijuana, and two bundles of cash that had been folded with a rubber band.

10. As Officer Montero tried to detain BOOMER, BOOMER tried to pull away, stating that the drugs and cash were already inside of the vehicle when he entered it. Officer April O'Neill,

3

who had just arrived, ordered the driver, Dawson, to step out of the vehicle. Officer Montero then took a closer look within the vehicle and observed a Taurus 9mm handgun, roughly 5.2 grams of additional suspected crack cocaine, roughly 32.7 grams of marijuana, and cash on the floorboard where BOOMER had been seated.

11. The officers searched a large blue bag sitting on the rear seat, discovering many additional clear plastic bags containing a total of roughly 350 grams of suspected marijuana and roughly 330 grams of crack cocaine, as well as a large sum of cash.

12. Officer Montero then walked back over to BOOMER and asked if he had any weapons on his person. BOOMER said no. Officer Montero then searched BOOMER and recovered an empty magazine that fit the handgun from the rear floorboard from his left-front pants pocket and a large amount of cash from his right-front pants pocket. As Officer Montero spoke with BOOMER, Officer Montero observed cash falling onto the ground from BOOMER's pant legs. Officer Montero then located more cash concealed within BOOMER'S pant legs. Officer Montero subsequently performed a thorough search of BOOMER and recovered a white rock-like substance suspected to be crack cocaine in his right front pants pocket.

13. While Officer Montero dealt with BOOMER, Officer O'Neill observed Jelami Smith in the area of 5 Freedom Court. Upon contact, Officer O'Neill observed that Smith had been shot and was bleeding. Officer O'Neill followed the blood trail back to 5 Freedom Court and observed a 9mm cartridge and a spent 9mm shell casing on the front porch. More officers arrived and conducted a protective sweep of 5 Freedom Court. As the Officers entered the residence, they observed a 9mm cartridge and bullet holes in a couch.

14. During the sweep, Officer O'Neill located a plastic bag containing roughly 3.6 grams of suspected crack cocaine lying in the residence's driveway next to the driver's side of a

4

white Mercedes Benz bearing Virginia Handicap tags 86172HP. She also observed what she believed to be a plastic bag containing crack cocaine sitting on the rear seat of the Mercedes.

15. On the morning of September 18, 2018, at about 3 a.m., a state search warrant was obtained and executed on the white Mercedes Benz bearing Virginia Handicap tags 86172HP. Portsmouth Police Detective Whitson recovered the plastic bag, which contained roughly 1.5 grams of suspected crack cocaine, and the Virginia registration from the vehicle's glovebox, which indicated that the Mercedes was registered to Charles Algernon BOOMER, BOOMER's father, at 1226 Highland Avenue in Portsmouth.

16. Roughly an hour later, a search warrant was obtained and executed at 5 Freedom Court. Officers recovered suspected crack cocaine totaling roughly 20.26 grams, four bags of suspected marijuana totaling 8.8 grams, three digital scales, one 9mm cartridge, twenty-one spent shell casings, and a Direct TV bill in the name of BOOMER.

17. All the drugs field-tested positive for cocaine and marijuana, respectively. The Virginia Department of Forensic Science is now testing the recovered cocaine for the presence of cocaine base.

18. Portsmouth police charged BOOMER with possession of cocaine with intent to distribute–third offense, possession of marijuana with intent to distribute–second offense, possession of a firearm by a convicted felon, possession of a firearm while in possession of narcotics, and possession of ammunition by a convicted felon. All of BOOMER'S charges were later nolle prossed by the Portsmouth Commonwealth Attorney's Office.

19. During the course of this investigation, the investigative team has spoken to several individuals in reference to their knowledge of, and involvement with BOOMER. The accounts of

three of those sources, Confidential Sources One (CS-1), Two (CS-2), and Three (Cs-3), are described as follows.

20. Beginning in around August 2018, CS-1 observed BOOMER sell roughly two to four ounces of crack cocaine and two or more ounces of powder cocaine daily until September 17. On three occasions, CS-1 observed BOOMER obtain 12 to 13 ounces of powder cocaine from BOOMER's source of supply, "O."

21. CS-1 confirmed that BOOMER resided at 5 Freedom Court and stated that on September 17, 2018, CS-1 had observed BOOMER inside the residence roughly 12 to 15 ounces of cocaine, 1.5 to three ounces of crack cocaine, and a pound of marijuana. CS-1 stated that BOOMER used 5 Freedom Court as a distribution point for cocaine, crack cocaine, and marijuana. CS-1 stated that on the evening of September 17, 2018, armed intruders entered 5 Freedom Court and began firing guns. CS-1 stated that gunfire was exchanged with the intruders, which cause the intruders to flee. CS-1 stated that the cocaine, crack cocaine, and marijuana that were recovered from inside the Ford Fusion were BOOMER's drugs and that BOOMER had taken the drugs from 5 Freedom Court after the exchange of gunfire.

22. CS-2 stated that CS-2 and BOOMER supplied each other with cocaine. CS-2 purchased a half ounce to four and a half ounces of cocaine from BOOMER ten times, and most recently purchased four and a half ounces of cocaine from BOOMER in September 2018.

23. CS-3 stated that, beginning in December 2016, CS-3 sold crack cocaine obtained from BOOMER and two other sources. CS-3 purchased $50–$100, or one to two grams, worth of crack cocaine twice a week for nine months. From September 2017 to January 2018, CS-3 purchased from BOOMER one-quarter to half-ounce quantities of crack cocaine two to three times

a week. And from either January or February 2018 until June 2019, CS-3 purchased from BOOMER one ounce of powder cocaine each week.

24. CS-3 also stated that on just prior to the armed robbery on September 17, 2018, CS-3 observed BOOMER at 5 Freedom Court with forty-eight individually packaged one-ounce bags of cocaine inside. CS-3 stated that CS-3 purchased one of the one-ounce bags from BOOMER for $1,000 and left the residence.

25. CS-3 stated that BOOMER confided in CS-3 after the home invasion, stating that on the night of the incident, Dawson was inside the residence when several armed individuals entered and began firing. BOOMER told CS-3 that BOOMER returned gunfire and eventually made his way into a car that was parked by 5 Freedom Court.

26. In July and August 2019, the investigative team and I utilized CS-3 to conduct three controlled purchases of cocaine from BOOMER. Prior to each controlled purchase, CS-3 communicated with BOOMER at BOOMER's phone number, (757) 738-0389.

27. Before the first purchase, CS-3 contacted BOOMER by phone and ordered a quantity of cocaine. BOOMER agreed to the purchase and instructed CS-3 where and when to meet. Prior to CS-3 departing the investigative team, CS-3, and CS-3's vehicle were searched. CS-3 was then outfitted with audio and video recording equipment and given U.S. Government funds to use for the purchase. CS-3 did as instructed and responded to the predetermined location in Portsmouth, as followed by the investigative team. Upon arrival, Craig Dawson, a known co-conspirator of BOOMER, met with CS-3 and distributed roughly 28 grams of cocaine. Afterward, the investigative team met CS-3 at a neutral location and recovered the cocaine. CS-3 and CS-3's vehicle were again searched, with negative results. The cocaine was field tested and yielded a positive result.

28. Before each of the second and third purchases, CS-3 contacted BOOMER and ordered a quantity of powder cocaine. BOOMER agreed to the purchases and instructed CS-3 where and when to meet. Prior to CS-3 departing the investigative team, CS-3 and CS-3's vehicle were searched. CS-3 was then outfitted with audio and video recording equipment and given U.S. Government funds to use for the purchases. CS-3 did as instructed and responded to the predetermined locations in Portsmouth, as followed by the investigative team. Upon arrival, BOOMER met with CS-3 and distributed to CS-3 roughly 56 grams and 84 grams of powder cocaine, respectively. After each deal, the investigative team met CS-3 at a neutral location and recovered the cocaine. CS-3 and CS-3's vehicle were again searched, with negative results. The cocaine was field tested, yielding a positive result.

29. On August 16, an investigator obtained search warrants for two of BOOMER's known addresses—3910 Breezeport Way, #102, in Suffolk, Virginia; and 714 King Street Apartment 311, in Portsmouth. At about 9:45 a.m. on August 23, 2019, BOOMER was arrested as he was leaving the Breezeport residence. At the time of BOOMER'S arrest, he was in possession of $3,200 in cash and roughly four grams of suspected marijuana.

30. At about 10:16 a.m., I interviewed BOOMER in the presence of DEA Special Agent Kevin Cox and Portsmouth Police Detective J. Whitson. I gave BOOMER the *Miranda* warnings from a pre-printed DEA form. BOOMER acknowledged that he understood his rights and agreed to make a statement. I advised BOOMER that the investigative team had several state search warrants, including the Breezeport Way and King Street residences, and asked if anyone or anything that would impede or pose a danger to the investigative team was inside the residences.

31. BOOMER advised that his girlfriend, Chiquita Taylor, was currently at the Breezeport residence and that a semi-automatic handgun was in the bedroom, although he claimed

it was Taylor's gun. BOOMER also said that there could be up to three individuals inside the King Street apartment. Detective Whitson advised BOOMER that Detective Whitson knew that there were video cameras installed inside the King Street apartment and asked if BOOMER could view or control the cameras through his cellular telephone. BOOMER acknowledged that he could access the cameras and granted permission to Detective Whitson to access his cellular telephone and the someone inside the King Street residence. BOOMER identified the individual on camera as Dawson, the co-conspirator who had distributed the cocaine at the first controlled purchase.

32. Detective Whitson told BOOMER that BOOMER was being charged with three counts of possession of cocaine with intent to distribute. I then questioned BOOMER about his drug-trafficking history. BOOMER said that he has distributed cocaine for the past three to four years. BOOMER also admitted that, for the past five to six months, he purchased between three quarters of an ounce to one-ounce quantities of cocaine for resale an average of twice a week. BOOMER added that he would convert some of the cocaine into crack for resale. And BOOMER explained that he acted as a middleman for cocaine transactions during this time period. As a middleman, he would receive money up front from other cocaine distributors. Upon receiving their money, BOOMER would then place an order with his source of supply, retrieve the cocaine, and transport the cocaine back to the other distributors. BOOMER advised that while acting as a middleman, he made multi-ounce purchases ranging between two and four ounces per transaction.

33. BOOMER was questioned in reference to the home invasion that occurred at 5 Freedom Court on September 17, 2019. BOOMER advised that on the night of the incident, he had walked to a nearby store and then returned home when he heard gunshots. BOOMER advised that as he approached the parking lot by Freedom Court, someone hit him in the face with a gun. BOOMER added that he jumped in the backseat of a car to escape, and that upon entering the car,

he sat on cocaine. BOOMER was questioned in reference to the gun found at his feet on the floorboard and the magazine in his pocket at time of arrest. BOOMER denied owning the gun and denied that the police found the magazine on him.

34. At about 10:40 a.m., officers executed the Breezeport search warrant and recovered from the residence a SCCY 9mm semi-automatic pistol sitting on a table in the living room, as well as a magazine for the handgun, 41 rounds of 9mm ammunition, a money counter, and court paperwork addressed to BOOMER.

35. About an hour later, officers executed the King Street search warrant and arrested Dawson there. They also recovered approximately 24 grams of suspected cocaine, 24 grams of suspected crack cocaine, digital scales, packaging material indicative of the distribution of cocaine and crack cocaine, a credit card in BOOMER's name, and an identification card in his girlfriend Taylor's name. The drugs field-tested positive for cocaine.

36. A check of BOOMER'S criminal history revealed that he has been convicted of thirteen felonies, including at least three felony drug-trafficking convictions. He is likely an Armed Career Criminal.

37. Both the Taurus and SCCY handguns had been manufactured outside the state of Virginia and had traveled in interstate and foreign commerce.

IV. CONCLUSION

38. Based on the above facts, I believe that there is sufficient probable cause to charge Charles Algernon BOOMER III with conspiracy to distribute and possess with intent to distribute 280 grams or more of crack cocaine and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A); possessing with intent to distribute and distributing a quantity of a mixture and substance containing a detectable amount of cocaine, in violation of 21

U.S.C. § 841(a)(1), (b)(1)(C); possessing with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D); felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possessing a firearm in furtherance of, and using and carrying a firearm during and in relation to, drug-trafficking crimes, namely, possessing with intent to distribute cocaine and marijuana, in violation of 18 U.S.C. § 924(c)(1)(A).

Further your affiant sayeth naught.

Gary Parker, Task Force Officer
Drug Enforcement Administration

Read and Reviewed:

William B. Jackson
Assistant United States Attorney

Sworn and subscribed to before me this __13th__ day of September 2019.

UNITED STATES MAGISTRATE JUDGE